Presentment Date: July 13, 2021 at 12:00 p.m.
Objections Due: July 6, 2021 at 5:00 p.m.
Hearing Only Upon Objection: July 27, 2021 at 10:30 a.m.

WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for 138-77 Queens Blvd LLC*
156 West 56th Street
New York, New York 10019
Telephone (212) 237-1000
Attorney Appearing: Leslie Barr (lbarr@windelsmarx.com)

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>QB WASH LLC,<br>  *d/b/a* Blvd Auto Spa,<br><br>                    Debtor. | Chapter 7<br><br>Case No. 1-21-40301-ess |

**MOTION OF 138-77 QUEENS BLVD LLC FOR AN ORDER PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE DIRECTING THE PRODUCTION OF DOCUMENTS BY AND ORAL EXAMINATION OF THE DEBTOR'S PRINCIPAL AND CERTAIN RELATED PARTIES AND THE PRODUCTION OF DOCUMENTS BY THE DEBTOR**

**TO THE HONORABLE ELIZABETH S. STONG,**
**UNITED STATES BANKRUPTCY JUDGE**:

138-77 Queens Blvd LLC ("***Landlord***"), by and through its attorneys, Windels Marx Lane & Mittendorf, LLP, respectfully submits this Motion for entry of an Order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") directing (1) the production of documents by and oral examination of Zachary Silver ("***Zachary***"), the principal of the above-captioned debtor ("***Debtor***"), (2) the production of documents by Wash Funding LLC ("***Wash Funding***"), a putative creditor controlled by Zachary's family that purports to hold a $2.2 million claim, (3) the production of documents by and oral examination of Scott Silver ("***Scott***"), Zachary's father and the individual believed to control Wash Funding, and (4) the production of documents by Debtor; and in support thereof, states as follows:

## INTRODUCTION

1. Debtor's business consisted of a car wash and oil change operation conducted at a single location in Jamaica, Queens (the "***Business Premises***") that was leased from Landlord. Debtor failed to pay Landlord rent for nearly a year before filing its bankruptcy petition, and owed Landlord over $350,000 as of the petition date, representing more 60% of the value of all claims not held by insider-related parties. *See* Ex. B.[1] Debtor's petition for relief and accompanying schedules (Ex. A, "***Petition & Schedules***") (Doc. 1) listed Wash Funding as its sole putative secured creditor, holding a $2.2 million claim.

2. At the initial Meeting of Creditors (the "***341 Meeting***"), Debtor's principal, Zachary, admitted that Wash Funding was, in fact, owned by his family and had received tens of thousands of dollars from Debtor after it had defaulted under the lease for the Business Premises (the "***Lease***"). Ex. C at 8-9.[2] Zachary stated that he "[did not] know" when Wash Funding had last advanced funds, "[p]ossibly" last year. *Id.* at 8. Landlord's investigation, however, has revealed that Wash Funding was formed in April 2020, when Debtor was already in default on rent, and discovery obtained from Debtor's bank in Landlord's state court eviction action shows that Wash Funding never advanced Debtor any funds. Ex. D; Wohl Decl. ¶¶ 19, 24.

3. Wash Funding filed a UCC-1 Financing Statement in June 2020, Ex. E, and Landlord's investigation has identified the Wash Funding business address as belonging to Sherman Financial Group, which employs Zachary's father and is one of the largest distressed consumer debt collection firms in the country. Zachary's father, Scott, is the general counsel of

---

[1] References in the form "Ex. __" are to exhibits to the Declaration of Ethan Wohl dated June 14, 2021 attached as **Exhibit 1** ("***Wohl Decl.***").
[2] Debtor's petition misidentifies the entity as "Walsh Funding LLC." It was identified correctly in a UCC-1 Financing Statement it filed in June 2020 and in the Stipulation and Order later avoiding its lien (Doc. 40). *See* Ex. E and Ex. K.

Sherman Financial Group. The diversion of assets from Debtor to insider-related parties while it was insolvent thus was carried out by an individual with deep expertise in debtor-credit law.

4. Zachary also admitted at the 341 Meeting that (1) he began drawing a salary from Debtor only after it was in default under the Lease, and (2) he caused Debtor to pay money to at least one third party for services unrelated to Debtor's business shortly before commencing the present case. Ex. C at 11-14.

5. Zachary also disclosed at the 341 Meeting that cash receipts represented 20-25% of business revenue, *id.* at 12, but cash "was rarely deposited" and these amounts were not recorded in the Debtor's books. *Id.* at 12-13. If Zachary's testimony is credited regarding the percentage of Debtor's cash transactions, then the unaccounted-for cash is in the range of $110,000 to $235,000 during the portion of 2020 that Debtor was in default under the Lease.

6. For the benefit of the Debtor's estate (the "*Estate*"), Landlord now seeks the disclosure necessary (1) to identify all monies improperly paid by Debtor to its principal and his family, and (2) evaluate the bona fides of Wash Funding's asserted $2.2 million claim.[3] In the event of a proposed settlement with the Debtor's principal and his family, such disclosure also would be necessary for Landlord to evaluate the settlement and for the Court to make an independent, informed judgment whether such settlement was fair and equitable and in the best interests of the Estate.

7. As provided in the proposed Order attached as **Exhibit 2**, the discovery requested hereby (1) shall be conducted at Landlord's sole cost and expense, (2) copies of all documents produced and transcripts of oral examinations conducted shall be provided to the trustee of the

---

[3] Wash Funding consented to avoidance of its asserted security interest in assets of the Debtor pursuant to a Stipulation and Order approved by the Court on June 2, 2021 (Doc. 40), Ex. K, but its claim is unaffected thereby.

Estate, David J. Doyaga, Sr. (the "**Chapter 7 Trustee**"), and (3) Landlord undertakes to conduct a thorough review of the documents produced and report its findings to the Chapter 7 Trustee.[4]

## JURISDICTION AND VENUE; STATUTORY PREDICATES

8.     This Court has jurisdiction over this Motion and any hearings or orders entered pursuant thereto under 28 U.S.C. §§ 157 and 1334 and the Order of the United States District Court for the Eastern District of New York dated December 5, 2012, captioned *In the Matter of The Referral of Matters to the Bankruptcy Judges* (Amon, C.J.). Venue of this case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought by this Motion are section 105(a) of title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**") and Rule 2004 of the Bankruptcy Rules. This matter is a "core proceeding" within the meaning of 28 U.S.C. § 157(b).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

**A.     Background Concerning the Debtor's Business and Relationship with Landlord**

9.     Landlord's predecessor leased the Business Premises in 2010 under a 25-year triple-net lease (the Lease) to a prior tenant, and Debtor purchased its car wash and oil change business as a going concern in January 2016, receiving an assignment of the Lease in connection with the business purchase.   Wohl Decl. ¶ 7.

10.     Landlord is owned 50% by Maureen Wohl, age 92, and 25% each by her two adult children. The Business Premises were previously owned for several decades by Maureen Wohl's husband, Bert Wohl, until his passing in March 2019.  Wohl Decl. ¶¶ 5, 6.

---

[4] We advised counsel to the Chapter 7 Trustee of Landlord's intention to make this motion and provided drafts of these motion papers in late May; counsel has not advised us of the Chapter 7 Trustee's position with respect thereto.

{11926398:3}                                             4

11. Debtor's principal, Zachary, was age 24 when he acquired the business conducted at the Business Premises in January 2016, and appeared to have little business experience. *Id.* ¶ 8.

12. In late 2016, less than a year after assuming the Lease, Debtor began intermittently paying the rent late. Debtor also experienced other operational problems, including repeated Fire Department violations related to machinery used in the business, and scathing customer reviews on public websites. Starting in the summer of 2018, Debtor began consistently paying rent late. *Id.* ¶ 9.

13. The parties' principals met twice in February 2020. At the meetings, before the onset of COVID-19 in the New York area, Zachary stated that the rent was unsustainable and he would need a rent reduction to continue in the Business Premises. *Id.* ¶ 10. Following these meetings, Debtor ceased making rental payments. *Id.*

14. As a result of COVID-19, Debtor's business was subsequently closed for approximately seven weeks, from about March 23, 2020 through about May 8, 2020. *Id.* ¶ 11.

15. In June 2020, after Debtor had resumed operations, the parties conferred and Landlord offered two months' free rent and, alternatively, offered Debtor the option of surrendering the Business Premises with no liability for the arrears. *Id.* ¶ 12.

16. Debtor declined both offers, retaining possession of the Business Premises but withholding all rent payments and allowing arrears for the water it was utilizing for its operations to accumulate. As of the date it commenced the present case, Debtor owed arrears under the Lease totaling $370,535, including unpaid real estate taxes and insurance totaling $95,756 and unpaid water and sewer arrears and municipal violations totaling $33,032. *Id.* ¶ 15; Ex. F.

17. In August 2020, when permitted under state law, Landlord served notices to cure, followed by a notice terminating the Lease, effective September 3, 2020. The next day,

Landlord commenced an ejectment action in New York Supreme Court, Queens County (the "***Ejectment Action***") and moved for an order directing payment of use and occupancy *pendente lite*. *Id.* ¶ 14.

18. Supreme Court, Queens County granted Landlord's motion for use and occupancy by Order entered January 15, 2021 (the "***U&O Order***"), directing the Debtor to pay prospective use and occupancy and the water and sewer arrears, and post a bond for the rent arrears. Ex. H.

**B.    The Present Case**

19. Debtor did not make the payments or post the bond required by the U&O Order. Instead, it commenced the present case on February 8, 2021 by filing with this Court a voluntary petition for relief under chapter 7 of the Bankruptcy Code.

20. Debtor's Petition & Schedules (Ex. A) listed assets of $31,742[5] and liabilities of $2,676,809, including the putative $2.2 million secured claim of Wash Funding. Debtor understated Landlord's claim; the actual prepetition amount due to Landlord is shown in Exhibit F, and a corrected schedule of creditors, setting forth Landlord's prepetition claim and additional claims filed by third parties post-petition, is attached to the accompanying Wohl Declaration as Exhibit B.

21. Debtor's Petition & Schedules, executed under penalty of perjury by Zachary, falsely stated that Wash Funding was not an insider or related party. Ex. A (Schedule D).

22. The Chapter 7 Trustee, David J. Doyaga, Sr., was appointed the interim Chapter 7 trustee of the Estate, and thereafter became the permanent Chapter 7 trustee of the Estate by operation of law.

23. On March 9, 2021, Landlord and the Chapter 7 Trustee entered into a stipulation providing that (1) Landlord waived any claim against the Estate for post-petition use and

---

[5] Cents are excluded from all amounts herein.

occupancy of the Business Premises, and (2) the Chapter 7 Trustee acknowledged that the Lease had duly terminated pre-petition, on September 3, 2020, pursuant to the termination notice that Landlord had served. This Court "so ordered" the parties' stipulation on March 16, 2021, Doc. 19, and Landlord thereupon took possession of the Business Premises.

### C.     **The Putative Secured Creditor**

24.     In June 2020, approximately eight months before the commencement of this case and during the period Debtor was withholding rent, Wash Funding, as secured party, filed a UCC-1 Financing Statement (the "***UCC-1***") with the New York Secretary of State, naming Debtor as the debtor and purporting to perfect a security interest in "All items of Personal Property, Fixtures and Equipment located on, Related to or used in connection with the Car Wash and Lube located at 138-77 Queens Blvd, Jamica [sic] NY 11435." Ex. E.

25.     The UCC-1 identified a business address for Wash Funding at 200 Meeting Street, Suite 206, Charleston, South Carolina 29401.

26.     Landlord's investigation discovered that Wash Funding was a Delaware limited liability company formed on April 1, 2020, at a time when Debtor had already ceased paying rent to Landlord. Ex. D.

27.     Landlord's investigation also discovered that the address for Wash Funding belongs to Sherman Financial Group ("***Sherman***"), where Zachary's father Scott is employed as General Counsel.

28.     While Sherman's own website, www.sfg.com, is notably devoid of contact information and does not identify any individuals associated with the firm, Landlord's investigation found a settlement agreement between Sherman and a state regulator resolving claims for improper debt collection practices that identified the same business address set forth on Wash Funding's UCC-1, and identified Scott as Sherman's general counsel. Ex. I at 11.

{11926398:3}                                                    7

29. Sherman was recently described in a Wall Street Journal article as "[o]ne of the biggest and least-known companies" in the consumer debt collection industry. *See* Ex. J, Shane Shifflett & Justin Scheck, *Most Big Debt Collectors Backed Off During the Pandemic. One Pressed Ahead.*, Wall St. J., Apr. 7, 2021.

30. In addition to concealing the related-party nature of Wash Funding in Debtor's Petition & Schedules, Zachary's responses to questions by the Chapter 7 Trustee's counsel at the 341 Meeting were evasive and incomplete (Ex. C at 7-8):

> MR. ROSEN: . . . There is a secured creditor on your business, correct?
>
> MR. SILVER: As I understand.
>
> MR. ROSEN: Okay. And who is that secured creditor?
>
> MR. SILVER: Wash Funding, LLC.
>
> MR. ROSEN: And are the principals of that family members of yours?
>
> MR. SILVER: I believe the principals are trusts.
>
> MR. ROSEN: Okay. Now, are the trusts related to family members of yours?
>
> MR. SILVER: Yes.
>
> MR. ROSEN: . . . And when did the security interest come into place, do you know?
>
> MR. SILVER: No. I believe the security interest went into place -- I don't know, I'm sorry.
>
> MR. ROSEN: Was it last year?
>
> MR. SILVER: Again, if I gave an answer, I would be making it up. I don't know the exact intricacies of when the security interest went into place off the top of my head.
>
> MR. ROSEN: Okay. When was the last time that lender advanced any money to the business?
>
> MR. SILVER: I don't know.
>
> MR. ROSEN: Was it last year?
>
> MR. SILVER: Possibly.
>
> MR. ROSEN: And who -- if those funds came in, who would they have come in from?

> MR. SILVER: I'm not sure.

31. In fact, the bank statements of Debtor produced to Landlord by Citibank cover the entire period from January 2019 through December 2020 and show that Wash Funding never provided any funding to Debtor. Wohl Decl. ¶ 24.

32. Zachary also acknowledged that Wash Funding had received payments from Debtor on account of its putative secured claim during the period that Debtor was withholding the rent due to Landlord (Ex. C at 9):

> MR. ROSEN: Over the past year, did you make any payments to the secured lender?
>
> MR. SILVER: Yes.
>
> MR. ROSEN: And do you recall approximately how much you paid them?
>
> MR. SILVER: Very approximately, $30,000 over the year.

33. On May 28, 2021, the Chapter 7 Trustee filed a Stipulation and [Proposed] Order (the "***Wash Funding Stipulation***") reciting that Wash Funding "may be an insider of the Debtor" and providing, *inter alia*, that Wash Funding's asserted lien on personal property of the Debtor would be "set aside as a preference." Doc. 36 ¶ 1. The Court so-ordered the Wash Funding Stipulation on June 2, 2021 (Doc. 40). Ex. K.[6]

34. The Wash Funding Stipulation did not avoid or limit Wash Funding's claim against the Estate.

### D.    Other Payments Benefitting the Debtor's Principal

35. Zachary also testified at the 341 Meeting that he began drawing a salary from Debtor only after it had defaulted on rent payments to Landlord (Ex. C at 14):

---

[6] Landlord filed a response and conditional objection to the Wash Funding Stipulation on June 2, 2021, Doc. 38, shortly before public notice via ECF of the Court's approval thereof. As set forth in Landlord's response and conditional objection, Landlord objects to certain disputed factual assertions and legal conclusions set forth in the Wash Funding Stipulation that would be prejudicial to it if adopted by the Court and deemed binding on Landlord in later proceedings.

> MR. ROSEN: I went through the bank statements. Were you on salary at the business?
>
> MR. SILVER: In late August of 2020, I decided to start taking a salary. I managed to take that salary seven times between late August and early October before it became aware to me that it was financially infeasible to do.

36. It is unclear what services Zachary actually provided to the Debtor, how many hours per week he devoted to the business, and whether any salary was in fact justified. Wohl Decl. ¶ 36.

37. Zachary also acknowledged that a debit card payment to a land surveyor in November 2020 from the Debtor's bank account was "unrelated to the business with QB Wash." Ex. C at 10.

38. While the surveyor payee referenced in the preceding paragraph was identified on the bank statements received by Landlord because the payment was by debit card, the large majority of payments from Debtor's bank account were made by check (including the payments to Wash Funding and Zachary discussed above), for which Landlord has obtained no payee information. Wohl Decl. ¶ 38; Ex. G (showing payment by type). Landlord is, accordingly, presently unable to determine whether other payments by Debtor were also unrelated to its business and for the benefit of insiders.

### E.     The Unaccounted-for Cash

39. Zachary also testified that Debtor received substantial amounts of cash that were not deposited in its bank account or accounted for on its books (Ex. C at 11-12):

> MR. ROSEN: . . . [F]irst of all, was there cash generated from the business, and if so, how did you deposit it, and was it all deposited?
>
> MR. SILVER: Cash was generated from the business. Cash was rarely deposited. It was generally used to pay employees or vendors.
>
> MR. ROSEN: Okay. Approximately what percentage of the business was in cash?

> MR. SILVER: It's a very hard thing to approximate, but I would say, again, very, very difficult to approximate. Twenty percent to 25 percent.
>
> MR. ROSEN: Okay. Did you keep any books and records of these cash transactions?
>
> MR. SILVER: No.

40. Over the course of 2020, electronic ACH deposits constituted over 92% of ordinary-course business deposits; the remaining deposits were made via teller or ATM, *see* Ex. G. Debtor's bank statements do not indicate whether these deposits were checks or cash. Wohl Decl. ¶ 34. If Zachary's statement that cash accounted for 20-25% of total revenue is correct, then the unaccounted-for cash during the period from March to December 2020, while Debtor was in default on the Lease, is in the range of $110,000 to $235,000. *See* Ex. G.

41. Zachary further testified that in the close to five years that he operated Debtor prior to August 2020, he had not received any salary, distributions or other payments from it (Ex. C at 14-15):

> MR. ROSEN: . . . Since you started the business, have you taken any distributions out of the business?
>
> MR. SILVER: No.
>
> . . .
>
> MR. ROSEN: Okay. Were you -- so while you were running this business, how were you living?
>
> MR. SILVER: Excuse me?
>
> MR. ROSEN: How were you paying for your expenses? Were you taking distributions in cash?
>
> MR. SILVER: No.
>
> MR. ROSEN: Is this your sole source of employment?
>
> MR. SILVER: Yes.
>
> MR. ROSEN: So were you -- so I go back to my question. So how were you paying your bills? Were you paying your bills out of the business? Were you taking cash or were you getting money elsewhere?
>
> MR. SILVER: I was getting money elsewhere.

>    MR. ROSEN:  From family?
>
>    MR. SILVER:  My wife works and my family works.

42.    It is unexplained why Zachary chose to continue to operate Debtor for close to five years if its business was providing him no financial return.

## F.    Debtor's Unexplained 2020 Operating Deficit

43.    By failing to pay Landlord the base and additional rent due under the Lease for nearly a year before its bankruptcy filing, Debtor avoided $291,319 in rent payments, and saved at least an additional $22,058 by failing to pay for the water it consumed in its operations over this period – a total of over $313,000 in occupancy costs that it owed and failed to pay.[7]  At the time of its bankruptcy filing, however, Debtor had only $22,712 in cash on hand according to its Petition & Schedules.  Ex. A.  According to comments by the Chapter 7 Trustee at the 341 Meeting, Debtor ultimately turned over even less.  Ex. C at 5.

44.    There is no explanation for where the cash due to Landlord went.  No indication exists that Debtor had been running operating deficits that would account for these losses, and the legal and appraiser fees paid by Debtor in 2020, plus the admitted insider payments to Wash Funding and Zachary, collectively account for only a modest fraction of the unpaid occupancy costs – perhaps $110,000.  *See* Ex. G; Wohl Decl. ¶ 31.

45.    COVID-19 also does not explain the losses.  According to its bank statements, Debtor's overall deposited business revenues in 2020 declined approximately 13% ($130,613) from 2019, which is fully accounted for by the approximately seven weeks that Debtor was closed from late March to early May 2020.  *See* Ex. G.  As a result of the business closure, Debtor's business expenses were correspondingly much smaller in these months according to its

---

[7] The balance of Landlord's pre-petition claim consists of late fees, interest, municipal fines incurred by Debtor, and additional water charges that Landlord is now contesting.

{11926398:3}                                            12

bank statements, resulting in a small net income (excluding unpaid rent) during the three months affected by the closure (March-May 2020), *see id.*

46. An explanation for the balance of the missing funds awaits the examinations sought hereby.

## RELIEF REQUESTED

47. Landlord seeks the entry of an Order of the Court, substantially in the form attached as **Exhibit 2**, (1) directing the production of documents by and oral examination of Zachary, (2) directing the production of documents by Wash Funding, (3) directing the production of documents by and oral examination of Scott, (4) directing the production of documents by Debtor, (5) authorizing the undersigned counsel to issue subpoenas in furtherance of the foregoing disclosure, and (6) authorizing and directing Landlord to provide the Chapter 7 Trustee with copies of examination transcripts, all documents produced to it, and the results of its analysis thereof.

## ARGUMENT

48. Bankruptcy Rule 2004 provides in relevant part that:

**(a) Examination on motion**

On motion of any party in interest, the court may order the examination of any entity.

**(b) Scope of examination**

The examination of an entity under this rule . . . may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge. . . .

49. "The scope of a Bankruptcy Rule 2004 examination is 'unfettered and broad.' Its purpose is to facilitate the discovery of assets and the unearthing of frauds and has been likened to a quick 'fishing expedition' into general matters and issues regarding the administration of the

bankruptcy case." *In re Orion Healthcorp, Inc.*, 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019) (quoting *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996)).

50.     As Bankruptcy Rule 2004 explicitly states, "[e]xaminations under Rule 2004 may be conducted by any party in interest, not just the trustee." *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (authorizing examination by creditor). *Accord In re Feldman*, 597 B.R. 448, 453 (Bankr. E.D.N.Y. 2019) (examination by creditor); *Orion Healthcorp, Inc.*, 596 B.R. at 235 (examination by creditor's committee).

51.     Bankruptcy Rule 2004's reference to "the examination of any entity" has likewise been recognized to apply broadly: "[a]ny third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004). This includes nonparty transferees of debtor assets, *see In re Mavashev*, 559 B.R. 332, 337 (Bankr. E.D.N.Y. 2016); *In re Vantage Petroleum Corp.*, 34 B.R. 650 (Bankr. E.D.N.Y. 1983), trading partners and putative creditors, *e.g.*, *In re Transmar Commodity Grp. Ltd.*, No. 16-13625-JLG, 2018 WL 4006324, at *2 (Bankr. S.D.N.Y. Aug. 17, 2018), and family members involved in a debtor's financial affairs, *see In re Bello*, 528 B.R. 562 (Bankr. E.D.N.Y. 2015); *Desiderio v. Parikh*, No. 12-CV-2148 JS, 2013 WL 1305499, at *1 (E.D.N.Y. Mar. 28, 2013).

52.     "The party seeking Rule 2004 discovery has the burden to show good cause for the examination it seeks . . . and relief lies within the sound discretion of the Bankruptcy Court." *Orion Healthcorp, Inc.*, 596 B.R. at 235 (quoting *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, No. 09-11893-SMB, 2014 WL 5486279, at *2 (Bankr. S.D.N.Y. Oct. 30, 2014) (ellipsis in original)).

53.     Here, the documents sought are tailored to the core purposes of Bankruptcy Rule 2004: identifying improper diversion of Debtor assets to insiders and related parties, and

evaluating the bona fides of Debtor's largest putative creditor, who purports to hold nearly 80% of the total value of the claims in Debtor's creditor body. *See* Ex. B.

54. Good cause is shown, as set forth above, by the admissions by Debtor's principal that funds were paid to him and related persons while Debtor was insolvent, and by the evidence presented above showing that the purported claim of Wash Funding was not based on value actually advanced by it.

55. The highly intentional nature of the acts by Scott and Zachary – formation of a new legal entity to act as creditor at a time when Debtor was already insolvent, followed by entry into agreements between the new entity and Debtor – as well as the active concealment of the new entity's related-party nature in filings in this Court, further supports the thorough examination of insider transactions sought by this motion.

56. In the event the Chapter 7 Trustee reaches a compromise with Zachary and his family, the disclosure sought hereby will also be needed to enable Landlord to reach an informed view of the merits thereof, and will assist the Court in performing its obligation to "make an informed and independent judgment of whether [the] settlement is 'fair and equitable' and in the best interests of the estate," *In re Telcar Group, Inc.*, 363 B.R. 345, 352 (Bankr. E.D.N.Y. 2007), giving "proper deference to [creditors'] reasonable views." *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

57. The disclosure sought hereby addresses the specific areas of concern presented above:

    (a) Requests Nos. 1 and 2 seek disclosure of documents related to ownership and control of Wash Funding and its alleged claim, for the purpose of addressing the bona fides of Wash Funding's claim and evaluating the grounds for (i) seeking to recharacterize it as equity or challenge it as

        entirely fraudulent, and (ii) challenging the payments to Wash Funding as preferences and/or fraudulent transfers;

(b) Request No. 3 seeks communications between Zachary and Scott concerning Debtor to identify other insider transfers that may have been executed using third parties or other means of concealment;

(c) Requests Nos. 4 through 6 and 10 seek Debtor's accounting records, copies of checks, bank statements, and tax returns to enable Landlord to analyze Debtor's finances and identify other potential insider transfers;

(d) Requests Nos. 7 and 8 seek transaction-level data from Debtor's ticketing system and its electronic payments account to enable Landlord to determine the actual amount of unaccounted-for cash generated by Debtor while insolvent;

(e) Request No. 9 seeks to inform Landlord regarding staffing of Debtor's business and enable Landlord to evaluate the justification for Zachary's salary payments in late 2020 and identify other individuals with knowledge of Debtor's business; and

(f) The two oral examinations requested by this motion, of Debtor's principal, Zachary, and his family member, Scott, seek to obtain testimony from two individuals who were directly involved in efforts to transfer value from Debtor while it was insolvent.

**WHEREFORE**, Landlord requests that the Court grant this Motion in its entirety and enter an Order substantially in the form attached as Exhibit 2, together with such other and further relief as is just.

Dated: New York, New York  
       June 14, 2021

Respectfully submitted,

WINDELS MARX LANE & MITTENDORF, LLP  
*Counsel for 138-77 Queens Blvd LLC*

By: */s/ Leslie S. Barr*  
     Leslie S. Barr (lbarr@windelsmarx.com)  
     156 West 56th Street  
     New York, New York 10019  
     Tel. (212) 237-1000 / Fax. (212) 262-1215