**KLESTADT WINTERS JURELLER**
   **SOUTHARD & STEVENS, LLP**
200 W 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Fred Stevens
Christopher J. Reilly

*Counsel to Zachary Silver, Scott Silver and Wash*
   *Funding LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re                                                                      :
                                                                              :          Chapter 7
QB WASH LLC,                                                     :
                                                                              :          Case No. 21-40301 (ESS)
                                        Debtor.              :
------------------------------------------------------------x

**OBJECTION AND STATEMENT IN RESPONSE TO MOTION OF 138-77
QUEENS BLVD LLC FOR AN ORDER PURSUANT TO RULE 2004 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE DIRECTING THE
PRODUCTION OF DOCUMENTS BY AND ORAL EXAMINATION OF THE
DEBTOR'S PRINCIPAL AND CERTAIN RELATED PARTIES AND THE
<u>PRODUCTION OF DOCUMENTS BY THE DEBTOR</u>**

**TO THE HONORABLE ELIZABETH S. STONG,**
**UNITED STATES BANKRUPTCY JUDGE:**

Zachary Silver, Scott Silver and Wash Funding LLC ("<u>Wash Funding</u>," and together with

the other parties, the "<u>Silvers</u>"), by their counsel, Klestadt Winters Jureller Southard & Stevens,

LLP, as and for their objection and response (the "<u>Objection</u>") to the motion of 138-77 Queens

Blvd LLC (the "<u>Landlord</u>") for an order directing the oral examination and production of

documents from the Silvers in connection with the above-referenced debtor's (the "<u>Debtor</u>")

bankruptcy case [Docket No. 43] (the "<u>Motion</u>"), respectfully set forth and represent as follows:

## PRELIMINARY STATEMENT

The Debtor was a financially unsuccessful carwash purchased by Zachary Silver through the Debtor in 2016 for $2.53 million with loans from his family and the third-party seller.  The Debtor's business failed for many reasons including: (i) that the Debtor paid too much for the carwash and carried an unsustainable amount of debt as a result; (ii) the steep increases in minimum wage in New York City commencing in December 2018; (iii) the overpriced lease with the Landlord; and finally (iv) the COVID-19 pandemic.  The Debtor's story is not atypical and is one that this Court sees on a regular basis.

The Motion is the continuation of the needless and unproductive hostile dispute between the Debtor and Landlord that precipitated the bankruptcy filing.  The Debtor needed and sought a decrease in rent from the Landlord.  The Landlord refused and fought the Debtor over the request.  The Landlord won and the Debtor is now out of the space and liquidating under Chapter 7.  The Landlord goes to extreme and personal measures in the Motion to vilify the Debtor's principal and his family, but it is the Silvers who have lost approximately $2 million in the Debtor.  Nobody is more disappointed by the Debtor's demise than the Silvers.

The discovery sought by the Landlord is motivated solely by hostility, is inappropriately personal, and is not a proper use of Rule 2004.  That said, the Silvers would not necessarily object to certain of the discovery sought by the Landlord if it were appropriately sought by the impartial and experienced Trustee, who is represented by competent counsel.  Indeed, the Silvers have responded to and have provided all documents and information requested by the Trustee.  In addition, the Silvers agreed without any fight to the avoidance of Wash Funding's lien against the Debtor's property as potentially preferential.  The Silvers are here to cooperate with the Trustee but should not be subjected to the continuing campaign of harassment by the Landlord.

If the discovery sought by the Landlord is actually necessary and not designed just to harass the Silvers, the Silvers expect the Trustee will ask for it. The motivation to harass is also highlighted by the fact that it is quite unlikely that the Landlord will see a distribution in this small asset case considering administrative expenses and the existence of a large, priority tax claim.

Contrarily, the Silvers believe that the focus of any examination should be on the Landlord. While the Silvers lost around $2 million with the Debtor, the Landlord just inherited the Debtor's fully equipped carwash which upon information and belief is now being advertised for sale at around $1.5 million (see advertisements annexed hereto as Exhibit A). To the Silvers' knowledge, the Landlord has no intention of voluntarily sharing any of the sale proceeds with the Debtor's estate and has received an unbelievable windfall as a result of the Debtor's demise. It is the Landlord who has benefited at the expense of the Debtor's estate and not the Silvers.

For all the foregoing reasons and for those set forth below, the Silvers respectfully request that the Landlord's Motion be denied. The Silvers would have no objection to continuing to provide the Trustee – who is motivated by legitimate purposes – with documents and information as they have already been doing.

## RELEVANT BACKGROUND

1.      On or around June 2, 2010, the Landlord and Blvd Wash & Lube Ltd. entered into a twenty-five year lease agreement (the "Lease") for the premises occupied by a carwash located at 138-77 Queens Blvd., Jamaica, New York 11435 (the "Carwash"). Blvd Wash & Lube Ltd. was owned by Joseph and Nicholas Capparelli (collectively with Blvd Wash & Lube Ltd., the "Capparellis").

2.      At some point between 2010 and 2016, the Capparellis sold the Carwash to LB One LLC, d/b/a Boulevard Auto Spa (the "Seller") and the Landlord consented to the assignment of the Lease to the Seller.

3.      On or around December 4, 2015, the Debtor entered into a contract with the Seller to purchase the Carwash.  The Debtor purchased the Carwash from the Seller for a total purchase price of $2,530,000.  The purchase price was funded by a note issued by the Debtor to the Seller in the face amount of $1,330,000 (the "Seller Note"), and a loan in the amount of $1,174,321.09 made by a Silver family trust (the "Silver Trust I").  The loan from the Silver Trust I was used to pay off a prior obligation of the Seller to the Capparellis.  The Debtor and Seller closed on the transaction on January 8, 2016.

4.      Following acquisition of the Carwash, the Debtor realized that the Carwash was not nearly as profitable as it was understood to be.  Subsequently, the Seller Note was paid off for a lump sum payment of $967,500.  That payoff was funded by another loan from a Silver family trust (the "Silver Trust II," and collectively with the Silver Trust I, the "Silver Trusts"), increasing the Silvers' investment in the Debtor to over $2 million.  On June 9, 2017, the Debtor issued an amended and restated secured promissory note to the Silver Trust I, and an original secured promissory note to the Silver Trust II on account of the loans each made to the Debtor (the "Silver Loan I" and "Silver Loan II," respectively, and collectively, the "Silver Loans").  Neither of the Silver Trusts took steps to timely perfect the security interests they were granted in the Debtor's assets.

5.      On or around June 15, 2020, the Silvers created Wash Funding for the purpose of receiving, holding and enforcing the Silver Loans, and the Silver Trusts assigned their respective

Silver Loans to Wash Funding.  On June 29, 2020, Wash Funding recorded a UCC-1 financing statement evidencing and perfecting its security interest in the Debtor's assets.

6.      After losing its fights with the Landlord, the Debtor had no alternative but to file for bankruptcy protection before this Court on February 8, 2021 (the "Petition Date").  David J. Doyaga, Sr. was subsequently appointed chapter 7 trustee (the "Trustee") of the Debtor's estate and has since duly qualified and is currently serving as permanent trustee.

7.      Shortly after his appointment, the Trustee raised the issue that perfection of Wash Funding's security interest in the Debtor's assets was preferential because it took place within one year of the Petition Date.  Without any challenge, Wash Funding entered into a stipulation with the Trustee on or around May 27, 2021, which was "So Ordered" by this Court on June 2, 2021, avoiding Wash Funding's security interest [Docket No. 40].

8.      The Silvers estimate their losses in connection with the Debtor at around $2 million.  The Trustee is currently ably conducting his investigation and the Silvers have been both cooperative and responsive.

9.      Upon information and belief, the Landlord has now leased the premises and Carwash to the Capparellis and have, upon information and belief, marketed it for sale at approximately $1.5 million.  This is at least the second time that the Capparellis and the Landlord have worked together to flip the Carwash.

## OBJECTION

10.     Courts have placed limits on Rule 2004 discovery and have broad discretion in limiting such discovery.  The bankruptcy court in In re MF Global Inc., 2013 WL 74580, at *1 (Bankr. S.D.N.Y. 2013), explained parameters for limiting examinations as follows:

> In granting a Rule 2004 examination request, the bankruptcy court is required to make a finding of good cause for the examination. ePlus, Inc. v. Katz (In re

Metiom, Inc.), 318 B.R. 263, 268 (S.D.N.Y. 2004). Good cause is shown if the examination sought is "necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." Id. (citations omitted); see also In re Express One Int'l, Inc., 217 B.R. 215, 217 (Bankr. E.D.Tex. 1998). The court must also weigh the relevance of the discovery against the burden it will impose on the producing party. In re Coffee Cupboard, Inc., 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991); see also In re Texaco Inc., 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987) ("[T]he examination should not be so broad as to be more disruptive and costly to the [producing party] than beneficial to the [requesting party]."). Rule 2004 cannot be used for "purposes of abuse or harassment" and it "cannot stray into matters which are not relevant to the basic inquiry." In re Mittco, Inc., 44 B.R. 35, 36 (Bankr. E.D.Wis. 1984).

11.    There are important limits to the scope of an examination taken pursuant to Rule 2004. See In re Cinderella Clothing Industries, Inc., 93 B.R. 373 (Bankr. E.D.Pa. 1988). A Rule 2004 examination should only be used for the legitimate purpose of obtaining information relating to "the acts, conduct, or property or to the liabilities and financial condition of the debtor or to any matter which may affect the administration of the debtor's right to a discharge." Fed. R. Bankr. P. 2004. The examination of a witness about matters having no relationship or no effect on the administration of an estate is improper. In re Johns–Manville, Inc., 42 B.R. 362, 364 (S.D.N.Y. 1984). Furthermore, like other methods of discovery, Rule 2004 examinations may not be used to annoy, embarrass or oppress the party being examined. In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).

12.    Rule 2004 requires a balance of the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination. Relevance of information sought does not alone demonstrate that there is good cause for requiring production. In re Coffee Cupboard, Inc. 128 B.R. at 514.

13.    Courts deny requests for leave to conduct Rule 2004 examinations when the movant seeks discovery into matters that are not relevant to its basic inquiry or if the movant

seeks the examination for purposes of abuse or harassment. In re Mittco, Inc., 44 B.R. at 36; In re Texaco, Inc., 79 B.R. at 553 ("[T]he scope of [a Rule 2004] examination is not limitless; the examination [of the debtor] should not be so broad as to be more disruptive and costly to the debtor than beneficial to the creditor."); In re Duratech Industries, Inc., 241 B.R. 283, 289 (E.D.N.Y. 1999) (in upholding the bankruptcy court's decision to deny a creditor's Rule 2004 application, the court held that "[t]here are, however, limits to the scope of Rule 2004 examinations. Significantly, Rule 2004 examinations may not be used for the purposes of abuse or harassment."); see also, In re Martin, 208 B.R. 807, 810-11 (N.D.N.Y. 1997) (denial of Rule 2004 motion for impermissible purpose of abuse and harassment), aff'd, 1998 WL 405966, at 3 (2d Cir. 1998).

14.     For the reasons set forth below, the Motion should be denied.

**a. The Proposed Rule 2004 Examinations are Designed to Harass the Silvers**

15.     The Landlord is clearly angry that the Debtor did not pay rent during the year leading up to the Petition Date during the COVID-19 pandemic. The Landlord is entitled to be frustrated. The Silvers are similarly frustrated that the Landlord would not give a reasonable rent reduction. However, the Landlord's frustration has inappropriately turned to a vendetta, and the Motion is designed to further the vendetta rather than further the legitimate interests of the Debtor's estate.

16.     Rule 2004 applications are typically short in length and state a simple investigatory purpose by the applicant. The Motion is something very different. It spans 17 pages and is accompanied by over-120 pages of exhibits. The Landlord goes to great lengths to discuss irrelevant information about Scott Silver and his current position at a company unrelated to the Debtor making conclusory and unnecessary comments such as, "[t]he diversion of assets

from Debtor to insider-related parties while insolvent thus was carried out by an individual with deep expertise in debtor-creditor law." The Landlord also goes out of its way to disparage the Debtor's principal and his testimony at the meeting of creditors.

17.     What is clear from the Motion is that the Landlord hates the Silvers and the Motion is designed to harass the Silvers. Indeed, the likelihood that the Landlord will receive a distribution in this case is slim yet the Landlord is seeking discovery from four parties including an exhaustive list of documents.

### b. If the Discovery Sought is Necessary, the Trustee Should be the One Obtaining it

18.     The hypothetical causes of action that the Landlord seeks discovery on would belong to the Debtor's estate under the exclusive purview of the Trustee. The Trustee is a very experienced professional and impartial fiduciary and has employed experienced and competent counsel. If anything that the Landlord is seeking is actually important to the administration of the Debtor's estate, the Trustee is the right person to seek it because the Trustee is tasked with administering the estate and because of the Landlord's clear animus towards the Silvers.[1]

19.     Indeed, the Trustee is doing his job and doing it well. The Trustee already successfully demanded and obtained the avoidance of Wash Funding's lien and has requested relevant documents and information from the Silvers, which the Silvers have provided expeditiously. The Trustee is more than capable of conducting any necessary discovery of the Silvers, without the inappropriate hostility and harassment of the Landlord.

---

[1]   A creditor's right to seek this type of information might be more appropriate in an individual's chapter 7 case where the creditor is seeking information related to claims that it may bring objecting to the dischargeability of debt or the debtor's discharge, but not here where the discovery is solely related to potential claims that would belong exclusively to the Trustee.

### c.  It is the Landlord who has Real Exposure to the Debtor's Estate

20.  The Silvers have lost around $2 million investing in the Debtor.  Meanwhile, the Landlord was out only a year's rent which it values at around $360,000 but has now taken over the Carwash for free which, upon information and belief, it values at $1.5 million.  It is clear who the winner and losers are here.

21.  The Landlord has now been a part of a number of sales of the Carwash in the last ten years – first with the Capparellis, then from the Capparellis to the Seller, then from the Seller to the Debtor, and now by the Landlord and Capparellis to yet another party.  The Landlord knows all too well that the Carwash does not produce enough value to support what the Silvers paid for it, and yet it gladly facilitated the doomed transaction.  Likewise, the Landlord probably knew that the Carwash was not worth what the Capparellis sold it to the Seller for.

22.  If there is a question to be asked, it is why the Landlord did not receive a fraudulent transfer in connection with obtaining for free the Debtor's Carwash, which the Silvers paid over $2.5 million for in 2016 and which is now believed to be listed for sale at $1.5 million, an issue the Trustee or the Silvers may pursue another day.

*[Continued on next page]*

## **CONCLUSION**

23.     It is respectfully submitted that this Court should not permit the Landlord to exercise its hostilities against the Silvers through judicially sanctioned discovery under Rule 2004.  The Trustee should conduct whatever investigation he deems appropriate and only if the Landlord believes the Trustee has fallen short should the Landlord be able to pursue the type of discovery it currently seeks.

Dated:   New York, New York
        July 6, 2021

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:  _/s/ Fred Stevens_
      Fred Stevens
      Christopher J. Reilly
      200 W. 41st Street, 17th Floor
      New York, New York 10036
      Tel: (212) 972-3000
      Fax: (212) 972-2245
      Email: fstevens@klestadt.com
             creilly@klestadt.com

      *Counsel to Zachary Silver, Scott Silver and
      Wash Funding LLC*

# **Exhibit A**

# **Carwash Sale Advertisements**

Financeable Amazing Location Monster Car Wash in New York | Loopnet

 

Log In    Sign Up    Advertise

# Financeable Amazing Location Monster Car Wash

## Queens, NY



| | |
|---|---|
| Asking Price: | $1,550,000 |
| Established Year: | 1981 |

Listing ID: 1864095                 Listing provided by BizBuySell

### ASSET SALES DESCRIPTION

Car wash for over 30 years on the busiest road in Queens

Now open and building up, business is getting very profitable

The building is a full city block roughly 6,000 sq ft

The car wash was just closed and renovated

80-foot tunnel with top of the line equipment

30 percent down payment required with favorable financing terms

20-year lease

### DETAILED INFORMATION

| | |
|---|---|
| Location | Queens, NY |
| Facilities | Location, Location, Location! Lube, Convenience Store, Car Wash, Auto Repair, and more. |

7/6/2021                          Financeable Amazing Location Monster Car Wash in New York | Loopnet

| | |
|---|---|
| Financing | 1000000 |
| Support & Training | Yes |
| Reason for Selling | other business interests |

🛈 Report an Issue with this listing

## SIMILAR LISTINGS



### Financeable Amazing Location Monster Car Wash
Queens, NY
Price: $1,550,000



### Automated Car Wash Priced To Sell
Queens, NY
Price: $1,100,000



### Christian Brothers Automotive

Available Nationwide

FRANCHISE

Cash Required: $85,000

The LoopNet service and information provided therein, while believed to be accurate, are provided "as is". LoopNet disclaims any and all representations, warranties, or guarantees of any kind.

About Us

Contact Us

Search

Find a Broker

Product Overview

Mobile

7/1/2021

Buy a profitable car wash, repair and lube in queens

 

MENU

---

 Listed by: **Empire Business Management**

---

# Profitable Car Wash, Repair And Lube In Queens For Sale

Queens, New York, US

| | |
|---|---|
| Asking Price: | **$1,550,000** |
| Sales Revenue: | **Not applicable** |
| Cash Flow: | **Not applicable** |

30 Percent Down Payment, Convenient Neighborhood Business

Car wash for over 30 years on the busiest road in Queens
Now open and building up, business is getting very profitable
Building is a full city block roughly 6,000 sq ft
Car wash was just closed and renovated
80 foot tunnel with top of the line equipment
30 percent down payment required with favorable financing terms
20 year lease

---

## Property Information

**Real Estate:**            Lease

**Lease Terms:**            20 year lease

**Location:**               Location, Location, Location! Lube, Convenience Store, Car
                            Wash, Auto Repair and more.

## Other Information

**Owner financing:**

Owner financing is available. Please contact the seller for more information.

**Financing available:**

550,000 down